**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| 1. AARON BENJAMIN AMAYA, as Personal Representative of the Estate of KELLY MAY BROWNING, deceased,<br><br>Plaintiff,<br><br>v.<br><br>1. BOARD OF COUNTY COMMISSIONERS OF COTTON COUNTY, OKLAHOMA;<br>2. JOHN COFFELL, individually;<br>3. LORI HEDGES, individually;<br>4. TOMI WEIR, identified in County records as ELIZABETH WEIR, individually; and<br>5. JOHN/JANE DOES 1–10, individually,<br><br>Defendants. | ) | Case No. ________________<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT AND JURY DEMAND

Plaintiff Aaron Benjamin Amaya, as Personal Representative of the Estate of Kelly May Browning, deceased, alleges as follows:

## THE CASE

1. Cotton County officers recognized the precise danger that killed Kelly May Browning before the Cotton County Jail locked her in Cell 4. Their vehicle search found methamphetamine residue and empty plastic bags but no usable narcotics. Captain John Coffell later wrote that his training and experience told him the missing narcotics might have been swallowed.

2. Deputy Lori Hedges independently confronted the same danger. She warned Browning to disclose anything hidden "on or in" her, heard Browning repeatedly ask for a restroom, and brought her into the Cotton County Jail. Jailer Elizabeth Weir stood with Hedges at the bathroom door while Browning remained inside for approximately ten minutes.

3. Cotton County's own written rules required booking personnel to question both the committing officer and the detainee before accepting custody. The rules also required isolation and constant monitoring when swallowed contraband was reasonably suspected. The County had written the danger down. Its personnel did not act on it.

4. On information and belief, the jailer identified as Elizabeth Weir and the booking officer identified as Tomi Weir are the same Cotton County Jail Administrator. Weir watched the bathroom episode and then booked, searched, screened, marked Browning medically eligible, and placed her in Cell 4 without recorded vital signs, medical-professional evaluation, isolation, or the constant monitoring Cotton County required when swallowed contraband was reasonably suspected.

5. During the hours that followed, Browning's acute methamphetamine toxicity progressed. On information and belief, she repeatedly told jail personnel she did not feel well, asked for help, and asked several times to be taken to a hospital. Another detainee heard those requests and reported that jail staff ignored them. The employees who heard Browning did not obtain timely medical care.

6. Browning died in the Cotton County Jail less than ten hours after booking. The medical examiner measured methamphetamine at 33 micrograms per milliliter in her

femoral blood and found an empty, tied plastic bag with a defect in her vaginal canal. Her cause of death was acute methamphetamine toxicity.

7. This case concerns a Jail Administrator who watched Browning's ten-minute bathroom episode and then approved routine confinement, jailers who heard Browning repeatedly ask for a hospital, and a County system that still produced no medical evaluation, no constant monitoring, and no timely response before Browning died.

**PARTIES AND IDENTIFIED COUNTY PERSONNEL**

8. Kelly May Browning died on September 14, 2024, while detained as a pretrial detainee in the Cotton County Jail.

9. Plaintiff Aaron Benjamin Amaya is Browning's adult son. On August 10, 2026, the District Court of Cotton County entered an order appointing him Personal Representative of Browning's Estate in Case No. PB-2026-20. He brings this action only in that representative capacity.

10. Defendant Board of County Commissioners of Cotton County, Oklahoma is the statutory entity through which Cotton County may be sued. Cotton County operated the jail and acted through its Sheriff, deputies, jailers, detention employees, supervisors, and policymakers.

11. Defendant John Coffell was a Captain with the Cotton County Sheriff's Office. He acted under color of state law and is sued in his individual capacity.

12. Defendant Lori Hedges was a Deputy with the Cotton County Sheriff's Office. She acted under color of state law and is sued in her individual capacity.

13. On information and belief, Defendant Tomi Weir is the Cotton County employee whom County records identify as both "Tomi Weir" and "Elizabeth Weir." Weir was the Cotton County Jail Administrator, stood at Browning's bathroom door immediately before intake, and then booked, searched, screened, marked Browning medically eligible, and assigned Browning to Cell 4. She acted under color of state law and is sued in her individual capacity.

14. Weir's immediate succession from the bathroom door to booking, her identical surname in the County's records, and her documented role as Jail Administrator support the allegation that the "Elizabeth Weir" in Hedges's report and the "Tomi Weir" on the intake records are the same person.

15. Defendants John/Jane Does 1–10 are the presently unidentified Cotton County detention officers assigned to Browning's housing area, Cell 4, master control, welfare checks, supervision, or medical-response duties between booking and the time she was found. Each Doe against whom liability is asserted personally heard one or more of Browning's requests for help or hospital care, personally received a contemporaneous report of those requests, or personally observed and consciously disregarded her serious medical need, and had authority to summon or obtain medical care. Each acted under color of state law and is sued in an individual capacity.

## JURISDICTION AND VENUE

16. This action arises under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

17. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3).

18. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to these claims occurred at the Cotton County Jail in Walters, Oklahoma. Cotton County lies within the Western District of Oklahoma under 28 U.S.C. § 116(c).

19. Browning's claims under 42 U.S.C. § 1983 survive her death and are prosecuted by her Estate through its court-appointed personal representative. Plaintiff seeks the damages available in a § 1983 death case.

20. Plaintiff demands a jury trial on every issue triable to a jury.

## FACTUAL ALLEGATIONS

### Officers recognized an ingestion and concealment danger before booking.

21. At approximately 11:24 p.m. on September 13, 2024, Coffell stopped a vehicle near State Highway 36 and County Road 1990 in Cotton County. Browning was the passenger and owner of the vehicle.

22. Hedges arrived with a police dog. The dog alerted to the vehicle.

23. The search produced empty plastic bags and a digital scale bearing a white crystal residue. A field test presumptively identified the residue as methamphetamine. The officers found no usable narcotics.

24. Coffell called Sheriff Tim King and reported that officers had found a scale bearing methamphetamine residue, that Browning owned the vehicle, and that she admitted the scale was hers. King participated in the decision to arrest Browning for possession of drug paraphernalia.

25. After Browning left the roadside in Hedges's vehicle, Coffell asked Browning's companion whether she had swallowed narcotics. Coffell explained in his own report that he asked for safety because his training and experience told him the missing drugs might have been consumed.

26. Coffell's own report shows that, before the jail accepted Browning, he recognized that the missing methamphetamine might be inside her body and treated that possibility as a safety concern serious enough to investigate.

27. Although Browning was already en route to the jail, Coffell could immediately call Hedges, booking staff, dispatch, emergency medical services, or another responsible officer. On information and belief, he gave no warning and took no action to secure a medical evaluation before the jail accepted Browning.

28. Alternatively, if Coffell transmitted that concern, the specific recipient or recipients who actually received it disregarded the express ingestion warning. Plaintiff pleads these alternatives because Defendants control the handoff and communication records. Under either alternative, Cotton County's arrest-to-booking handoff failed to produce medical evaluation or constant monitoring.

29. Hedges independently warned Browning during transport that anything concealed "on or in" her had to be disclosed before she entered the jail.

30. Browning repeatedly asked to use a restroom. At the jail, she remained in the bathroom for approximately ten minutes while Hedges and the jailer identified in Hedges's report as Elizabeth Weir stood at the door.

31. On information and belief, that jailer was Defendant Tomi Weir. Weir therefore personally watched the final episode in Browning's repeated effort to obtain restroom access and then accepted custody, searched Browning, completed her intake screening, and assigned her to a cell.

**The jail's required handoff and medical safeguards failed.**

32. Hedges delivered Browning to booking and signed the booking information. Cotton County's written policy required Hedges to report any suspected contraband in a private area of Browning's body to the jailer for notice to the Jail Administrator. Browning remained in Hedges's custody until intake staff medically screened, cleared, and accepted her, and Hedges remained responsible for taking her to a medical facility if immediate care was required before acceptance.

33. Weir performed Browning's booking, search, intake screening, medical-eligibility decision, and Cell 4 assignment at approximately 1:04 a.m. She booked Browning on charges of possessing a controlled dangerous substance and drug paraphernalia. Her screening also recorded high blood pressure, prescribed medication that Browning did not have with her, and treatment by a physician the preceding day for blood pressure. Cotton County's written policy required Weir to question both Hedges and Browning about Browning's current medical problems before accepting custody.

34. Weir personally knew about the ten-minute bathroom episode and knew that Browning was being booked on a controlled-dangerous-substance charge. Through the required intake exchange, Hedges's signed booking information, the jailer's observation at the bathroom door, and Weir's own search and screening, Weir knew

or, on information and belief, learned that Browning's arrest involved methamphetamine residue and packaging but no recovered usable narcotics, an internal-concealment warning, and repeated requests for a restroom. Taken together, those facts caused Weir to infer that Browning had concealed or consumed methamphetamine and faced a substantial risk of serious medical harm.

35. Tomi Weir was not merely an intake employee. Less than seven weeks before Browning's death, the Oklahoma State Department of Health addressed Tomi Weir as the Cotton County Jail Administrator. On information and belief, she remained the Jail Administrator when she personally booked Browning.

36. The Department of Health had inspected the jail on July 3, 2024, and notified Tomi Weir and the Sheriff on July 29, 2024, that the facility was not in substantial compliance with state detention standards.

37. That inspection found that the policy manual the Jail Administrator identified as current had no review schedule and no page showing that the Sheriff or Undersheriff had adopted it by signature and date.

38. During the same inspection, while accompanied by the Jail Administrator, the inspector found four white pills and one pink pill left unsecured on a table in a housing cell. The Department cited the jail for violating Oklahoma Administrative Code 310:670-5-8(2)(A), part of the same medical-care standard that governed intake screening, observation pending medical evaluation, and medication control. Together with the unadopted and unreviewed policy manual, that written citation gave Weir

and Sheriff King direct notice that the jail's paper medical safeguards were not reliably implemented in housing operations.

39. Weir's screening recorded no vital signs and bears no medical-professional signature. Cotton County's policy required a medical alert for heart problems and any chronic, potentially life-threatening illness, yet no medical alert appears in Browning's County file. Despite the drug-concealment sequence and the medical information she recorded, Weir marked Browning medically eligible and assigned her to Cell 4.

40. No physician, nurse, paramedic, or other qualified medical professional examined Browning before the jail placed her in Cell 4. On information and belief, no medical professional assessed the risk that she had concealed or absorbed methamphetamine.

41. Cotton County's written contraband policy required isolation and constant monitoring when staff reasonably suspected that a detainee had swallowed contraband. Its other written policies required medical screening, medical alerts, emergency referral, half-hour visual welfare checks for signs of mental or physical distress, and recorded welfare checks at least four times an hour for intoxicated intakes. Oklahoma's detention standards separately required intake screening immediately upon admission and before housing, followed by frequent observation until medical evaluation whenever screening indicated a significant medical problem.

42. The circumstances triggered those safeguards. Weir instead accepted Browning as a routine booking and placed her in Cell 4 without medical assessment, isolation, constant monitoring, or another response directed to the recognized ingestion and concealment danger.

**Browning repeatedly asked for hospital care, but the jailers responsible for her did not summon it.**

43. Browning remained in County custody for nine hours and fifty-six minutes between her 1:04 a.m. booking and the time she was found dead at 11:00 a.m.

44. On information and belief, the methamphetamine in Browning's body continued to produce acute toxic effects during the nearly ten hours she was locked in County custody.

45. On information and belief, during the hours before she was found dead, Browning repeatedly told Cotton County jail personnel that she did not feel well, asked for help, and asked several times to be taken to a hospital. Another detainee heard those requests and reported that jail staff ignored them.

46. One or more jail personnel personally heard Browning's repeated requests. These were express requests for medical intervention, not an ambiguous request for housing or a general complaint. Each employee who heard Browning knew she felt ill and wanted hospital care. No one summoned timely medical care.

47. On information and belief, Browning directed one or more of those requests to Weir while Weir remained responsible for her after intake. In the alternative, if the requests occurred after Weir's responsibility ended, the Doe jailers who assumed responsibility for Browning personally heard them. Defendants' staffing rosters, post assignments, logs, video, audio, communications, and jail-management-system audit history identify the employee who received each request.

48. Browning was found dead in the Cotton County Jail at 11:00 a.m. on September 14, 2024.

49. The autopsy documented pulmonary congestion and edema. Toxicology measured methamphetamine at 33 micrograms per milliliter in Browning's femoral blood. The medical examiner concluded that acute methamphetamine toxicity caused her death.

50. The medical examiner also found an empty, tied clear plastic bag with a defect in Browning's vaginal canal.

51. The empty defective package, acute methamphetamine toxicity, recognized concealment danger, and death in custody support the reasonable inference that concealed methamphetamine exposed Browning to the toxic dose before or during her confinement.

52. Browning remained in Cotton County's custody for nearly ten hours after booking. Weir recorded no vital signs before accepting her. On information and belief, no medical professional evaluated the drug-concealment risk, and the jailers who heard Browning's repeated hospital requests did not obtain timely care. Timely medical evaluation and treatment would have prevented Browning's death and shortened and reduced the conscious suffering she endured.

**Cotton County failed to provide a complete account of its response.**

53. After Browning's death, the Department of Health requested records concerning events after arrest, the paramedic response, and the official announcement of death. Cotton County Jail did not provide them, and the Department cited that failure as a deficiency.

54. The Department later reported that the jail had never reported Browning's in-custody death to the Department.

55. The missing response records and unreported death left the regulator without a complete contemporaneous account of what jail personnel did after Browning entered County custody.

**COUNT I — FOURTEENTH AMENDMENT DELIBERATE INDIFFERENCE**

**Against John Coffell, individually**

56. Plaintiff incorporates paragraphs 1–55.

57. The risk of concealed or consumed methamphetamine and the resulting acute toxicity presented an objectively serious medical need and a substantial risk of death.

58. Coffell personally inferred that the missing narcotics might have been consumed. He recorded that he considered the issue for safety and that his own training and experience supplied the inference.

59. Coffell had time and means to relay that concern to Hedges, booking personnel, dispatch, or emergency medical services and to request a medical evaluation before the jail accepted Browning. On information and belief, he did none of those things.

60. Coffell's deliberate disregard delayed evaluation and treatment and directly and proximately caused or contributed to Browning's conscious suffering and death.

**COUNT II — FOURTEENTH AMENDMENT DELIBERATE INDIFFERENCE**

**Against Lori Hedges, individually**

61. Plaintiff incorporates paragraphs 1–55.

62. On information and belief, Hedges knew the search found methamphetamine residue and empty bags but no usable narcotics. She warned Browning about contraband

concealed inside her body, heard repeated restroom requests, and observed the prolonged bathroom episode.

63. Those facts gave Hedges probable cause to suspect that Browning had concealed narcotics inside her body and caused Hedges to recognize the resulting risk of serious medical harm. Cotton County's policy required Hedges to report that suspicion to the jailer for notification to the Jail Administrator.

64. On information and belief, Hedges made no such report, requested no medical evaluation, signed the booking information, and returned to patrol. While Browning remained in her custody pending medical screening, clearance, and acceptance, Hedges failed to secure the evaluation and monitoring the danger required.

65. Hedges's deliberate disregard delayed evaluation and treatment and directly and proximately caused or contributed to Browning's conscious suffering and death.

**COUNT III — FOURTEENTH AMENDMENT DELIBERATE INDIFFERENCE**

**Against Tomi Weir, also identified as Elizabeth Weir, individually**

66. Plaintiff incorporates paragraphs 1–55.

67. Weir personally stood at Browning's bathroom door during the approximately ten-minute episode and then controlled Browning's booking, search, intake screening, medical-eligibility decision, and placement in Cell 4.

68. Before accepting Browning into routine housing, Weir knew Browning had just remained in the jail bathroom for approximately ten minutes and was being booked on drug charges. Through the required intake exchange and signed booking information, she knew or, on information and belief, learned of the methamphetamine

evidence, absence of recovered usable narcotics, internal-concealment warning, and repeated restroom requests. Her own screening recorded hypertension, missing prescribed medication, and medical treatment the preceding day, yet she recorded no vital signs and obtained no medical evaluation. These converging facts caused Weir to infer a substantial risk of serious medical harm.

69. Weir consciously disregarded that risk by accepting Browning into routine confinement and placing her in Cell 4 without vital signs, qualified medical evaluation, isolation, constant monitoring, or another risk-based medical response. On information and belief, Weir also personally received at least one of Browning's requests for help or hospital care while she remained responsible for Browning after intake and again failed to summon care.

70. Weir's deliberate choices delayed medical evaluation and treatment and directly and proximately caused or contributed to Browning's conscious suffering and death.

**COUNT IV — FOURTEENTH AMENDMENT DELIBERATE INDIFFERENCE**

**Against John/Jane Does 1–10, individually**

71. Plaintiff incorporates paragraphs 1–55.

72. On information and belief, Browning repeatedly told one or more Doe Defendants that she felt unwell, asked for help, and asked several times to be taken to a hospital.

73. Each Doe against whom Plaintiff seeks relief personally heard one or more of those requests or personally received a contemporaneous report that Browning was ill and requesting hospital care. Plaintiff does not seek liability merely because a person

worked at the jail, held a supervisory title, or was present during some part of Browning's confinement.

74. Each responsible Doe understood that Browning was asking for medical intervention, controlled access to her cell, emergency communications, or transport, and could summon or obtain care. Each consciously chose not to obtain timely care despite Browning's repeated requests.

75. Each responsible Doe's deliberate disregard delayed medical evaluation and treatment and directly and proximately caused or contributed to Browning's conscious suffering and death.

**COUNT V — MUNICIPAL LIABILITY UNDER 42 U.S.C. § 1983**

**Against the Board of County Commissioners of Cotton County, Oklahoma**

76. Plaintiff incorporates paragraphs 1–55.

77. Cotton County, through Sheriff Tim King as final policymaker for jail operations, controlled the custody handoff, intake screening, medical escalation, housing, welfare checks, training, and emergency response at the Cotton County Jail.

78. Cotton County had written policies requiring intake questioning, emergency referral, access to medical care, and isolation with constant monitoring when swallowed contraband was reasonably suspected.

**A. Cotton County did not implement its written medical safeguards.**

79. On information and belief, Cotton County's actual operating practice allowed nonmedical jailers to accept and house detainees through a paper screening without recorded vital signs, clinician review, a written drug-risk handoff, a documented

medical-escalation decision, or contemporaneous documentation and escalation of requests for hospital care. Cotton County's production contains no medical alert, observation log, welfare-check log, recorded request for care, clinician referral, or emergency-response record for Browning before she was found dead.

80. Browning's confinement shows how that practice operated. Coffell recognized the ingestion danger; Hedges encountered the internal-concealment and bathroom sequence; Weir watched the bathroom episode and approved routine housing; and the jailers responsible for Browning heard her requests for help and hospital care. On information and belief, the County's system still produced no medical alert, no qualified medical evaluation, no isolation, no constant monitoring, and no timely response.

81. Less than seven weeks before Browning's death, the Oklahoma State Department of Health notified Sheriff King that the jail was not in substantial compliance with state detention standards, that the purportedly current policy manual had not been formally adopted or placed on a review schedule, and that the jail was violating a medical-care standard in its housing area.

82. On information and belief, King allowed the same nonmedical intake, monitoring, and referral system to continue through September 14, 2024, without ensuring that the written medical safeguards were adopted, implemented, trained, audited, or enforced.

**B. Cotton County's fragmented system caused a denial of care.**

83. Alternatively, and independent of whether one employee possessed every material fact, the combined acts and omissions of Cotton County personnel operating through the County's system denied Browning medical care. One officer recognized possible ingestion, another encountered the internal-concealment sequence, the Jail Administrator watched the bathroom episode and approved routine housing, and the jailers responsible for Browning heard her ask for a hospital. Cotton County's practices divided the warning signs among its personnel without producing the medical response each stage required.

84. This claim does not impute one employee's knowledge to another. It challenges the County's own operating system, which divided critical drug-risk information among roadside, transport, booking, housing, welfare-check, and control personnel without assigning anyone responsibility to synthesize the warnings and make a documented medical-escalation decision.

85. The predictable result occurred here: Browning remained locked beyond her ability to obtain care while the County safeguards described above failed to produce care.

**C. Cotton County failed to train and supervise the nonmedical personnel who controlled access to care.**

86. Cotton County's policymakers knew that nonmedical deputies and jailers would encounter detainees suspected of concealing or ingesting drugs and would control whether those detainees obtained medical care. The County's own written policies recognized that danger and required isolation, constant monitoring, medical screening, and emergency referral.

87. On information and belief, Cotton County did not train or supervise its personnel on when suspected ingestion, internal concealment, or repeated requests for hospital care required immediate emergency-medical or clinician escalation and did not audit whether personnel followed the written intake, medical-alert, monitoring, and referral requirements.

88. The need for those measures was obvious, and the consequence of their absence was foreseeable: a detainee with concealed drugs, or one repeatedly asking for a hospital, could remain locked in a cell without care.

89. Those County practices, individually and in combination, were a moving force behind the denial and delay of medical care, Browning's conscious suffering, and her death.

## DAMAGES AND RELIEF

90. As a direct and proximate result of Defendants' conduct, Browning experienced conscious physical pain, medical distress, and suffering before her death.

91. Browning's Estate sustained losses recoverable under federal law, including Browning's conscious pain and suffering, medical and burial expenses, lost earnings based on her probable life expectancy, and other compensatory damages permitted by federal law and proved at trial.

92. The individual Defendants acted with the reckless or callous indifference to Browning's federally protected rights required for punitive damages. Plaintiff does not seek punitive damages against Cotton County or the Board.

93. Plaintiff is entitled to reasonable attorney fees and costs under 42 U.S.C. § 1988, prejudgment and post-judgment interest where allowed, and all other relief authorized by law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Aaron Benjamin Amaya, as Personal Representative of the Estate of Kelly May Browning, requests judgment against Defendants for:

A. compensatory damages in an amount determined by the jury;

B. punitive damages against the individual Defendants in an amount sufficient to punish and deter;

C. reasonable attorney fees and costs under 42 U.S.C. § 1988;

D. prejudgment and post-judgment interest where allowed;

E. a jury trial on every issue triable to a jury; and

F. all other relief the Court deems just and proper.

Respectfully submitted,

*s/D. Colby Addison*___________________________
D. Colby Addison, OBA No. 32718
Jason M. Hicks, OBA No. 22176
**LAIRD, HAMMONS, LAIRD, PLLC**
1332 S.W. 89th Street
Oklahoma City, Oklahoma 73159
Telephone: (405) 703-4567
Facsimile: (405) 703-4061
Email: colby@lhllaw.com
Email: jason@lhllaw.com
Attorneys for Plaintiff